**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

BRANDI SALLS, individually, and on behalf
of all others similarly situated,

Plaintiff,

v.

DIGITAL FEDERAL CREDIT UNION and
DOES 1 through 100,

Defendants.

**Case No.:**

**JURY TRIAL DEMANDED**

**CLASS ACTION**

<u>**COMPLAINT**</u>

Plaintiff Brandi Salls ("Plaintiff"), by her attorneys, hereby brings this class and representative action against Digital Federal Credit Union and DOES 1 through 100 (collectively "DFCU" or "Defendant").

<u>**NATURE OF THE ACTION**</u>

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, inter alia, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all others persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public. DFCU wrongfully charged Plaintiff and the class member overdraft fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to

1

DFCU's policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft fees breaches DFCU's contract with its customers, who include Plaintiff and the members of the Class.

4.     The charging for such overdraft fees also violates federal law. Because DFCU failed to describe its actual overdraft service in its Opt-In Contract (because the language in its Opt-In Contract fails to describe the actual method by which ECU calculates its overdraft fees, instead describing a method under which overdrafts only result when there is not enough money in the account to pay for a transaction), Regulation E (12 C.F.R. §§1005.17 *et seq*.) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq*.) prohibited DFCU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)), but DFCU did so anyway.

## PARTIES

5.     Plaintiff is a resident of Paxton, Massachusetts, and was a member of DFCU at all times relevant to the class action allegations.

6.     Based on information and belief, Defendant DFCU is a federally chartered credit union with its headquarters located in Marlborough, Massachusetts, and branch offices located in both Massachusetts and New Hampshire. DFCU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

7.     Without limitation, defendants Does 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of DFCU and, upon information and belief, also own and/or operate DFCU branch locations. Each of Defendants Does 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)). As used herein, where appropriate, the term "DFCU" is also inclusive of Defendants Does 1 through 100.

8.     Plaintiff is unaware of the true names of defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants Does 1 through 100 when the true

2

names are ascertained, or as permitted by law or by the Court.

9.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including Does) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are alter egos in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.     At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.     As to the conduct alleged herein, each act was authorized ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (1) the claims of plaintiffs aggregated together exceed $5,000,000, and (2) some putative class members are residents of different states than Defendant.  This Court also has subject matter jurisdiction under28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District and a substantial part of the events and/or omissions

giving rise to the claims asserted herein occurred in this District.

**FACTUAL ALLEGATIONS**

A.      **DFCU's Unlawful Charges of Overdraft Fees**

15.      DFCU is a credit union with branch offices in Massachusetts and New Hampshire with approximately $6.8 billion in assets.  DFCU offers its consumer banking customers a checking account.  One of the features of a DFCU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a DFCU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

16.      In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), DFCU assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

17.      Overdraft fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as DFCU, overdraft fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6 to 7% of the gross revenue of credit unions.  (Filene Research Institute Report, Overdraft Regulation A Silver Lining In The Clouds?  Filene Research Institute 2010).

18.      The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).  More than 60% of the transactions that resulted in a

large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled

"Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall

opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have

preferred the financial institution decline their transaction rather than paying the transaction into

overdraft and charging a very large fee (*id*. at p. 10).

19.     Unfortunately, the customers who are assessed these fees are the most vulnerable

customers.  Younger, lower-income, and non-white account holders are among those who were

more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25 year-old is 133% more likely to pay

an overdraft penalty fee than a 65 year-old.  (*Id*. at p. 3).  More than 50% of the customers

assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more

likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

20.     As a result of banks and credit unions taking advantage of millions of customers

through the unfair practice of charging overdraft fees through methodologies that maximize the

possible number of expensive overdraft fees to be charged, there has been a substantial amount

of litigation over the past few years. The outcome of these cases has predominantly fallen in

favor of plaintiffs with the banks and credit unions repaying their customers over one billion

dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

21.     The federal government has also stepped in to provide additional protections to

customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board

enacted regulations giving financial institutions the authority to charge overdraft fees on ATM

and one-time debit card transactions only if the institution first obtained the affirmative consent

of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

22.     To qualify as affirmative consent, the Opt-In Contract must include, but is not

limited to the following:

- The customer must be provided the overdraft policy, including the dollar

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_Rulemaking.pdf at p. 74-75.

amount of any fees that will be charged for an overdraft;

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

23.     At all relevant times, DFCU has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contract with members; (2) contrary to DFCU's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

24.     Under DFCU's contracts with its members, DFCU has promised that it will only assess an overdraft fee against an account when DFCU pays a transaction that results in a negative balance for that account.

25.     DFCU entered into a written contract with Plaintiff and its other customers titled "Truth-In-Savings Disclosure and Account Agreements . . . for Consumers" (hereinafter referred to as the "Account Agreement").  The Account Agreement contains a promise that DFCU will not charge overdraft fees for any type of transaction where there is enough money in the account to pay for the transaction.  The terms of the Account Agreement are reflected in the document dated May, 2015, which is attached hereto as Exhibit 1.  It states, "I agree that overdrafts, if paid in excess of funds in any loan or savings account, are payable on demand.  If overdrafts are to be covered by a transfer of funds from my Savings Account, such transfer(s) will generally be made only if there are sufficient funds on deposit at the time of transfer."  Nowhere in the agreement is

the term "available balance" or the term "available funds" defined.  The language of the Account Agreement, at most, informs the customer that temporary holds might take place on certain deposited items before they are made available, but nowhere is it stated in the Account Agreement that overdraft fees could result from holds placed on funds earmarked for pending transactions—the very practice this case confronts.

26.     Although it is Plaintiff's position that during the class period DFCU, under its contractual terms with the class members, could only charge an overdraft fee if the balance in the account became negative without regard to any deductions for holds on deposits, or any other holds, the absolute best case scenario for DFCU is that it was allowed under the Account Agreement to place holds on recently deposited, i.e., uncollected, funds in the account, and deduct those funds from the account balance in determining whether or not an overdraft has occurred, but that it was in any case not permitted to deduct from the account funds on which holds had placed because those funds had been earmarked for transactions which had not yet gone through.

27.     DFCU entered into a second agreement with Plaintiff and its other customers, which is titled "What You Need to Know About Overdrafts and Overdraft Fees" and is referred to herein as the "Opt-In Contract."  It is attached hereto as Exhibit 2.  DFCU was required by Regulation E to provide this agreement to Plaintiff and the class members, which governs the terms under which DFCU may assess Plaintiff and the Class members overdraft fees for ATM and non-recurring debit card transactions and provides them with the means to accept those terms.  In the Opt-In Contract, DFCU promised that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  This promise means that DFCU is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction. It does not in any way state that there will be deductions made from the money in the customer's account arising from holds placed on pending debit card transactions to create a different artificial balance other than the money in the account on which overdraft fees would be assessed,

nor does it state that holds placed on funds in the account arising from deposit holds would reduce the amount of money in the account for the purposes of determining when an overdraft has occurred, and an overdraft fee will be assessed.  Because the Opt-In Contract does not describe DFCU's actual overdraft service, the Opt-In Contract fails to comply with the requirements of Regulation E.  The Opt-In Contract nonetheless contains promises to which DFCU is contractually bound.

28.     DFCU's contractual promises in the Account Agreement and the Opt-In Contract to assess overdraft fees only when there is not enough money in the account to cover the item was also repeated to customers in other disclosures and marketing materials.  DFCU also promises in the Account Agreement and Opt-In Contract and marketing materials that it will not assess overdraft fees on ATM and non-recurring debit card transactions against any customer who does not "opt-in" to the overdraft service.

29.     However, directly contrary to this promise, DFCU's policy and practice is to ignore whether there is money in the account or a negative balance.  Instead, DFCU's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial and hypothetical internal calculation by which it deducts holds it has placed on either pending debit card transactions or deposits, rather than use the actual money in the account as required by the Opt-In Contract, or the funds in the account as required by the Account Agreement, without deductions for pending debit card transactions to determine whether an overdraft has occurred.

30.     The artificial balance created by DFCU which it used is not the customer's actual money in the account.  Rather, it is the balance in a customer's account minus anticipated future debits (debits that may or may not occur).  It might also minus deposit holds.  Not only is the practice of using this artificial balance method rather than the money in the account to determine whether a transaction results in an overdraft and thus is subject to an overdraft fee directly contrary to DFCU's Opt-In Contract as well as to its Account Agreement, but such practices have resulted in DFCU improperly charging unlawful overdraft fees.  DFCU created this "artificial balance" to increase overdraft fees it charged to its customers.

31.     DFCU's practice of charging overdraft fees, even when there is enough money in the account to cover a transaction presented for payment, is inconsistent with how DFCU expressly describes the circumstances under which overdraft fees are assessed.  Further, DFCU has charged its customers, including Plaintiff and the members of the Class, overdraft fees for ATM and/or non-recurring debit card purchases, without obtaining their appropriate consent to do so, in violation of Regulation E, and in violation of its contractual promises that it would not charge overdraft fees for ATM and non-recurring debit card purchases without obtaining its customers' separate consent, because DFCU's opt-in method or methods do not include providing its customers the information required to obtain their legally binding informed consent because, inter alia, the description in the Opt-In Contract did not describe what DFCU was actually doing, as required by Regulation E..

32.     The importance of Regulation E is highlighted by the fact that the Bureau's study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

33.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

34.     Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods.  The money in the account, without deduction for holds on pending transactions or on deposits, as stated (sometimes called the "ledger balance"), is the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.

35.     Further, based on information and belief, it is the balance used by DFCU to report

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

its deposits to regulators, shareholders and the public.  It is the deposit balance provided to

regulators in call reports and reserve reports.  It is the balance used in financial reports to

shareholders and the balance used for internal financial reporting.  It is the balance used by credit

reporting agencies in providing credit ratings of DFCU.

36.     When DFCU refers to balance or funds or money in the account, it is reasonable

to interpret and understand that as referring to the official balance in the account—which is the

balance without deduction for pending debit card transactions or deduction for holds on deposits.

In its study, the Bureau concluded that when a financial institution creates the "overall

impression" that it would determine overdraft transactions and fees based on the balance in the

account rather than an artificially created balance which has deducted pending transactions, then

the "disclosures were misleading or likely to mislead, and because such misimpressions could be

material to a reasonable consumer's decision-making and actions, examiners found the practice

to be deceptive."  The Bureau further found that "consumers could not reasonably avoid the fees

(given the misimpressions created by the disclosures)."  (Supervisory Highlights, Winter 2015, at

p.9.)

37.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks

relief as set forth below.

**B.      Unlawful Overdraft Fees Assessed to Plaintiff**

38.     Plaintiff was harmed by Defendant's policy and practice of charging overdraft

fees when there was money in her account to cover the transaction.  Plaintiff entered two

agreements with DFCU, wherein DFCU contracted to charge overdraft fees only if her account

did not contain enough money to cover the transaction.  By nonetheless charging Plaintiff

overdraft fees, DFCU breached its contracts with Plaintiff and violated Regulation E.  On

information and belief, at least one such instance has occurred within twelve months of filing this

complaint.  It will be necessary to obtain Defendant's records to determine each instance of such

a wrongful overdraft fee.  However, to give two examples, on December 18, 2014, Plaintiff had

$318.17 in her checking account when she made a debit card purchase on amazon.com for

$37.18, leaving her with a positive balance of $311.55. Despite that Plaintiff had enough money in her account to cover the transaction, she was assessed a wrongful $30 "Uncollected Funds" fee. Subsequently, on December 19, 2014, Plaintiff had $281.55 in her checking account when she made a debit card purchase for $27.97, leaving her with $253.58 in her account. Again, despite that she had enough money in her account to cover the transaction, Plaintiff was assessed another wrongful $30 "Uncollected Funds" fee. Plaintiff has a reasonable belief that a complete review of Plaintiff's and DFCU's records will show multiple instances in which DFCU improperly charged Plaintiff overdraft fees for transactions despite that Plaintiff had enough money in her account to cover the transactions.

39.     Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which DFCU assesses further overdraft fees. This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)   A complete evaluation of DFCU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

40.     Additionally, because the Opt-In Contract did not describe DFCU's actual overdraft service, DFCU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions.  Because it failed to provide the full and accurate disclosures to Plaintiff required by Regulation E, DFCU failed to obtain Plaintiff's fully informed consent as required by Regulation E in order for DFCU to be authorized to charge such overdraft fees. Because DFCU was not legally authorized to enroll Plaintiff into the Courtesy Payment program for non-recurring debit card and ATM transactions, DFCU violated Regulation E when it assessed *any* overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.

41.     Plaintiff was harmed by this practice when he was assessed overdraft fees for nonrecurring debit card and ATM transactions.  A complete evaluation of DFCU's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

42.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

43.     Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

44.     The "Class" is composed of two classes:

**The Positive Balance Class:**

> **All United States residents who have or have had accounts with DFCU who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transactions during the period beginning six years preceding the filing of this Complaint and ending on the date the Class is certified.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with DFCU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit**

**card transaction(s) during the period beginning August 15, 2010 and ending on the date the Class is certified.**

45.     Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

46.     This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

47.     **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that DFCU has approximately $6.8 billion in assets and operates branches throughout the states of Massachusetts and New Hampshire.

48.     Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of DFCU's customers have been harmed by its practices and thus qualify as Class members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

49.     **Commonality (Federal Rule of Civil Procedure 23(a)(2)** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class members include, but are not limited to, the following:

        a.     Whether, pursuant to the Opt-In Contract, Defendant promised to

Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction.;

       b.      Whether, pursuant to the Account Agreement, Defendant promised Plaintiff and the Class members that it would not charge an overdraft if there was enough money in the account to cover the transaction;

       c.      Whether Defendant breached the Opt-In Contract or the Account Agreement by assessing overdraft fees for transactions when customers' checking accounts contained enough money to cover the transactions;

       d.      Whether the language in the Opt-In Contract— "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."—described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees.

       e.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received; and

       f.      Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

50.    **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiff's claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Opt-In Contract and the Account Agreement, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and all Class members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class members.

51.    **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel

experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and her counsel intend to prosecute this action vigorously.

52.    **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

53.    Plaintiff is not aware of any separate litigation instituted by any of the class members against Defendant.  Plaintiff does not believe that any other Class members' interest in

individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class members and that he will adequately represent the Class.  This particular forum is a desirable forum for this litigation because Plaintiff resides in Paxton, Massachusetts and Defendant is headquartered in Marlborough, Massachusetts.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

54.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

55.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

     a.   Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

          1.   Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

          2.   Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

    b.   Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

        1.   The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

        2.   The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

        3.   The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        4.   The difficulties likely to be encountered in the management of a class action.

### FIRST CAUSE OF ACTION

**(Breach of the Opt-In Contract)**

56.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

57.    Plaintiff and each of the Class members entered into the Opt-In Contract with Defendant covering the subject of overdraft transactions.  This contract was drafted by and is binding upon Defendant.

58.    In the Opt-In Contract, Defendant promised that DFCU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

59.    The Opt-In Contract incorporated by reference all applicable laws regarding its subject matter, including 12 C.F.R. § 1005.17, which mandates that all opt-in contracts for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice, and bars financial institutions from assessing fees for non-recurring debit card and ATM transactions if they have not fully complied with that section's requirements.

17

60.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-In Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

61.     Defendant breached the express terms of the Opt-In Contract by, *inter alia*, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

62.     As a proximate result of Defendant's breach of the Opt-In Contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Account Agreement)

63.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

64.     Plaintiff and each of the Class members entered into the Account Agreement contract with Defendant covering the subject of overdraft transactions.  This contract was drafted by and is binding upon Defendant.

65.     In the Account Agreement, Defendant promised that DFCU would assess overdraft fees only when "funds" in the account were not "sufficient" to complete the transaction at issue.  Nowhere did the Account Agreement contract state that it would deduct pending debit card transactions for purposes of determining "sufficient funds" when assessing an overdraft fee.

66.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

67.     Defendant breached the express terms of the Account Agreement contract by, inter alia, assessing overdraft fees when there were sufficient funds in the account to cover the

transaction or transactions at issue.

68.     As a proximate result of Defendant's breach of the Account Agreement contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

69.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

70.     Plaintiff and each of the Class members entered into two contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Opt-In Contract and Account Agreement.  These contracts were drafted by and are binding upon Defendant.

71.     In the contracts, Defendant promised that DFCU would assess overdraft fees for ATM and debit card transactions only when there was not enough money in the account to cover the transaction.

72.     The contracts incorporated by reference all applicable laws regarding their subject matter, including 12 C.F.R. § 1005.17, which mandates that the Opt-In Contract for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice.

73.     Further, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

74.     The material terms of the contracts also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contracts.

75.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

76.     Defendant breached the implied covenant of good faith and fair dealing based on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to provide an accurate description of its overdraft program in its Account Agreement, failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions in its Opt-In Contract, and failing to permit its customers to choose whether to opt-in to the overdraft program for non-recurring debit and ATM transactions.  In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant executed a contractual obligation in bad faith, depriving Plaintiff and the Class members of the full benefit of the contract.

77.     As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

78.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

79.     As a result of the wrongful misconduct alleged above, Defendant unjustly

received millions of dollars in overdraft fees.

80.     The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices.  (CFPB Bulletin 2013-07[3], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

81.     Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION

### (Money Had and Received)

82.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

83.     Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

84.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## SIXTH CAUSE OF ACTION

### (Violation of Electronic Fund Transfers Act (Regulation E)

### C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))

85.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

86.     By charging overdraft fees on ATM and nonrecurring transactions, DFCU violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

87.     Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.)  The Opt In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in contract]... *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id*.) a "shall be clear and readily understandable."  (12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide segregated writing of its overdraft practices that are accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in.  The affirmative consent must be provided in a way mandated

by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

88.     The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless `demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E (Strubel v. Capital One Bank (USA), 2016 U.S.Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting Chase Bank USA v. McCoy, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).)

89.     DFCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  DFCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but DFCU pays it anyway, when in fact DFCU assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.  ..  Furthermore, upon information and belief, Defendant failed to meet some or all of the other requirements of 12 C.F.R. § 1005.17 in obtaining opt-ins of its customers to enter the overdraft fee program.

90.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions, DFCU has harmed Plaintiff and the Class. Due to DFCU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## **PRAYER**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.      For an order certifying this action as a class action;

2.      For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.      For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.      For an order enjoining the wrongful conduct alleged herein;

5.      For costs;

6.      For pre-judgment and post-judgment interest as provided by law;

7.      For attorneys' fees under the customer contracts, Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

8.      For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff and the Class members demand a trial by jury on all issues so triable.


Dated: June 15, 2018                    Respectfully submitted,

                                        /s/ Christine M. Craig
                                        _____
                                        Christine M. Craig, Esq., Bar No. 12842
                                        ccraig@shaheengordon.com
                                        Sean T. O'Connell, Esq. NH Bar No.11341*
                                        soconnell@shaheengordon.com
                                        SHAHEEN & GORDON, P.A.
                                        P.O. Box 977
                                        Dover, NH 03821-0977
                                        (603) 749-5000

Richard D. McCune, CA Bar No. 132124*
rdm@mccunewright.com
Jae (Eddie) K. Kim, CA Bar No. 236805*
jkk@mccunewright.com
McCUNE WRIGHT AREVALO LLP
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Taras Kick, CA Bar No. 143379*
Taras@kicklawfirm.com
Robert J. Dart CA Bar No. 264060*
Robert@kicklawfirm.com
THE KICK LAW FIRM, APC
815 Moraga Drive
Los Angeles, California 90404
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

*Pro Hac Vice applications to be submitted.

Attorneys for Plaintiff Brandi Salls
and the Putative Class