## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | |
|---|---|
| BRANDI SALLS, individually, and on behalf of all others similarly situated<br><br>      Plaintiff,<br><br>v.<br><br>DIGITAL FEDERAL CREDIT UNION and DOES 1 through 100,<br><br>      Defendants. | Case No. 4:18-cv-11262-TSH |

## DEFENDANT DIGITAL FEDERAL CREDIT UNION'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT

## I.  INTRODUCTION.

This is one of dozens of putative class actions filed in federal and state courts across the country challenging the longstanding banking practice of using "available balance" rather than "ledger balance" to determine when overdrafts occur. Plaintiff, Brandi Salls, like the Plaintiffs in the other overdraft cases filed by her counsel, does not (and cannot) allege using available balance is improper or illegal.  Rather, she claims Digital Federal Credit Union ("Digital") has breached contracts with its members – a Membership Agreement and a federally mandated disclosure form used to opt in to overdraft protection for one-time debit card transactions – because these agreements expressly require use of the ledger balance method.

135389307v1

This motion seeks dismissal of Plaintiff's claims because neither the Digital Membership Agreement nor the Digital Opt-in Form[1] require that Digital use the ledger balance to assess overdrafts. To the contrary, the agreements expressly provide that overdrafts will be determined on the basis of the "available balance" in members' accounts. *See* Compl., Ex. 1, p. 17 (stating that Digital may charge an *"overdraft"* fee as provided in the "schedule of Fees and Service Charges" when payment of a member's transaction "would draw *the available balance in the account* below the minimum balance for the account") (emphasis added). Two district courts have concluded that similar language in a credit union member agreement does not require use of the ledger balance. *See Tims v. LGE Community Credit Union*, No. 15-4279, 2017 WL 5133230, at *5 (N.D. Ga. Nov. 6, 2017), *appeal docketed*, No. 17-14968 (11th Cir. Nov. 7, 2017); *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1, 11 (D.D.C. 2016). While other courts have allowed overdraft breach of contract claims past the pleading stage, the contracts here, like those in *Tims* and *Chambers*, cannot plausibly be construed to mean Digital will use the "ledger balance method." Accordingly, Plaintiff's contract based claims should be dismissed. In addition, Plaintiff's claim for violation of Regulation E of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et seq.* 12 CFR §§ 205 *et seq.*, should be dismissed because it is barred by the applicable one-year limitations period.

## II.    BACKGROUND.

Digital is a federally-chartered, Massachusetts based credit union. Compl., ¶ 6.  Like most financial institutions, Digital offers an overdraft protection program for its members'

---

[1] For overdrafts on certain debit card and ATM transactions, the Federal Reserve (and now the federal Consumer Financial Protection Bureau ("CFPB")) requires consumers to "opt in."  To that end, the Federal Reserve drafted a model opt-in-form (the "Model Form") after extensive consumer testing (and knowing nearly all banks and credit unions used the available balance to assess overdraft fees). *See* 12 C.F.R. §§ 205 *et seq.*

135389307v1

checking accounts that permits it to assess overdraft fees when members overdraw their accounts but Digital pays the transaction anyway. *Id*., ¶ 16. For overdraft protection involving non-recurring debit card transactions, members must affirmatively opt in. *Id*., ¶ 27. Plaintiff entered into the Membership Agreement with Digital and opted in to overdraft protection for non-recurring debit card transactions. *Id*., ¶¶ 25, 27; *see also* Digital Membership Agreement (attached as Exhibit 1 to the Complaint) and Digital Overdraft Service Opt-In Form (attached as Exhibit 2 to the Complaint). Plaintiff was allegedly assessed two improper overdraft fees, one on December 18, 2014 and the other on December 19, 2014. Compl., ¶ 38.

### A. Available Balance and Ledger Balance.

Like all banks and credit unions, a Digital checking account has two balances: the "ledger" balance and the "available" balance. The "ledger" balance refers to the full amount of all deposits into a member's account, less payments that have actually been posted (or processed). *Tims*, 2017 WL 5133230, at *1. The "available" balance is the ledger balance minus funds for "electronic transactions that the institutions have authorized (and therefore are obligated to pay) but have not yet settled" and "holds on deposits that have not yet cleared." *Id*.

An example of how the balances are used for debit card payment transactions is as follows. If a member has a $100 ledger balance but uses her debit card like a credit card to buy dinner for $40, then there is a pre-authorization hold on her account (at the request of the restaurant), and her available balance (the money she has left to use) is only $60.00. In other words, the $40 the member just spent is no longer *available* for use. Her ledger balance is still $100 until the restaurant charge is submitted and posted to her account. On the credit side, if she deposits an out-of-the-state check in the amount of $5,000, a hold will be placed on all but $200. In this example, her available balance is $200 and her ledger balance is $5,000 even though the check may never clear.

## B.      Plaintiff's Allegations.

Plaintiff alleges six claims:  (1) breach of the of the Opt-in Form; (2) breach of the Membership Agreement; (3) breach of the implied covenant of good faith and fair dealing; (4) unjust enrichment/restitution; (5) money had and received; and (6) violation of the Electronic Fund Transfer Act (Regulation E).

Plaintiff's claims are all premised on the contention that the parties' agreements require Digital to determine whether an account is overdrawn based on "ledger balance."  *See* Compl., ¶¶ 56-90.  Plaintiff maintains that assessing overdraft fees based on the available balance is "(1) contrary to the express terms of [Digital's] contract with members; (2) contrary to [Digital's] representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees."  *Id.*, ¶ 23.  In support, Plaintiff cherry-picks portions of the Membership Agreement and the Opt-in Form.  She claims the Membership Agreement promises to assess overdraft fees based on the ledger balance because the contract does not specifically define the terms "available balance" or "available funds," and the Funds Availability Policy section only discusses holds on deposited funds.  *See id.*, ¶ 25.  She claims the Opt-in Form also promises that Digital will use the ledger balance because it states that overdraft fees will be assessed only "when you do not have enough money in your checking account to cover a transaction, but [Digital] pay[s] it anyway."  *Id.*, ¶ 27.  According to Plaintiff, funds are still in her account until a transaction is posted, so the "enough money" language must mean ledger balance.  *Id.*, ¶¶ 27, 29.

## C.      Digital's Opt-in Form.

Digital uses an Opt-in Form with language based on the federally mandated Model Form provided for in Regulation E. 12 C.F.R. § 205.17; *see* Compl. Ex. 2.  The form briefly describes Digital's overdraft services, including the types of transactions for which an overdraft fee may be

imposed, the dollar amount of overdraft fees charged by Digital, the maximum number of overdraft fees that may be charged, and the consumer's right to opt into, or opt out of, Digital's payment of overdrafts for one-time debit card payments. *Id.*

### D. Relevant Provisions of Digital's Membership Agreement.

Digital's Membership Agreement expressly states that overdrafts are assessed when a member transfers funds that exceed the "available balance" in her account. Compl., Ex. 1, p. 17. Specifically, the Agreement provides:

> 1. You may at your discretion, but are not obligated to nor shall you be liable for refusal to, pay funds from this account:
>
> a. When such payment would draw *the available balance in the account* below the minimum balance for the account as established from time to time by you (*overdraft* - See the Schedule of Fees and Service Charges). This may include *over- drafts created by checks, debit card, ACH, and other electronic means as applicable*.)

*Id.* (emphasis added). Other provisions of the Membership Agreement similarly state that only "available" funds may be used to make payments and that transactions in excess of "available" funds will result in an overdraft. *See id.* pp. 11, 19. In addition, the Membership Agreement devotes an entire section, *i.e.*, the "Funds Availability Policy," to informing members when their deposits become "available" to use. *Id.*, Ex. 1, pp. 29-31.

## III. ARGUMENT.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Gorelik v. Costin*, 605 F.3d 118, 121 (1st Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is

135389307v1

proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

Affirmative defenses, such as the statute of limitations, may be raised as a ground for dismissal under Rule 12(b)(6) "provided that facts establishing the defense [are] clear on the face of the plaintiff's pleadings." *Santana-Castro v. Toledo-Davila*, 579 F.3d 109, 113-14 (1st Cir. 2009) (citation omitted). "Where the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to sketch a factual predicate that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate." *Id*. at 114 (citation omitted); *see also Gorelik*, 605 F.3d at 121 ("Where, as here, dismissal is premised on the running of a statute of limitations, we will affirm when the pleader's allegations leave no doubt that an asserted claim is time-barred.") (citations omitted).

A.    **Plaintiff's Breach Of Contract Claims Fail Because The Membership Agreement And The Opt-in Form, Construed Together, Cannot Be Read to Require Assessment Of Overdraft Fees Based On Ledger Balance.**

The interpretation of a contract ordinarily is a question of law for the court. *See Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995); *BayBank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991). When interpreting a contract, the court must "give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible." *BayBank Middlesex*, 760 F. Supp. at 963 (citations omitted). "Where the wording of a contract is found to be unambiguous, the contract must be enforced according to its terms." *Id*. (citation omitted); *see also Gen. Convention of the New Jerusalem in the U.S. v. MacKenzie*, 449 Mass. 832, 835 (2007) ("we do not admit parol evidence to create an ambiguity when the plain language is unambiguous") (citations omitted); *Basis Tech. Corp v. Amazon.com*, 71 Mass. App. Ct. 29, 36 (2008). "[A]n ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation

6

contrary to the other." *Citation Ins. Co v. Gomez,* 426 Mass. 379, 381 (1998) (citation omitted). "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Id.* (citation omitted); *accord Ass. Of Indepen. BR Franchise Owners v. Baskin Robbins Franchising, LLC*, No. 16-10963-WGY, 2017 WL 4314607, at *3 (D. Mass. Sept. 27, 2017).

Applying these rules here, the motion to dismiss should be granted. As explained below, neither the Membership Agreement nor the Opt-in Form can be plausibly understood to require, as Plaintiff contends, that Digital must use the ledger balance (a term that does not even appear in either document) to determine overdraft fees.

1. **The Membership Agreement Explicitly Provides That Overdraft Charges Are Determined On The Basis Of The "Available Balance."**

Plaintiff contends that Digital breached the Membership Agreement by using the available balance to determine overdrafts instead of the ledger balance – *i.e.*, all of "[t]he money in the account without deduction for holds on pending transactions or on deposits." Compl., ¶ 34. That claim is at odds with the plain language of the Agreement.

To begin with, Plaintiff's claim is belied by the provision of the Membership Agreement that explains when overdraft fees will be assessed – a provision that Plaintiff completely ignores in the Complaint. That provision, which appears in the beginning of the section labeled "TERMS AND CONDITIONS APPLICABLE TO ALL CHECKING ACCOUNTS," states as follows:

> 1. You may at your discretion, but are not obligated to nor shall you be liable for refusal to, pay funds from this account:
>
> a. When such payment would draw *the available balance in the account* below the minimum balance for the account as established from time to time by you (*overdraft* - See the Schedule of Fees and Service Charges). This may include *over- drafts* created by checks, debit card, ACH, and other electronic means as applicable.)

Compl., Ex. 1, p. 17 (emphasis added). This provision makes clear that Digital may charge an "overdraft" fee as provided in the "schedule of Fees and Service Charges" when payment of a member's transaction "would draw *the available balance in the account* below the minimum balance for the account." *Id*. (emphasis added). There is only one plausible construction of this language: that Digital uses the "available balance" not the ledger balance to assess overdraft fees.

Other provisions of the Membership Agreement similarly make clear that only "available" funds may be used to make payments and that transactions in excess of "available" funds will result in an overdraft. *See id*. p. 11 ("All accounts are subject to your Schedule of Fees and Service Charges. You shall debit such charges against any account I own except my IRA. If there are insufficient funds *available*, the charges are payable on demand and, for checking accounts, will be treated as an overdraft.") (emphasis added)"); *id*. p. 19 ("I understand that *the funds must be available in my account* by the start of business on the day a check is presented to you for payment and that you may without liability accept, pay, guarantee, or charge items to the account in any order convenient to you.") (emphasis added). The Funds Availability Policy further advises members of various scenarios in which funds will not be immediately "available." *Id*., pp. 29-31.

To support her reading of the contract, Plaintiff primarily relies on a statement in the Agreement that provides "[i]f overdrafts are to be covered by a transfer of funds from [a member's] Savings Account, such transfer(s) will generally be made only if there are sufficient funds on deposit at the time of transfer." Compl., ¶ 25 (citing Compl., Ex. 1, at p. 20). That reliance is misplaced. The statement cited by Plaintiff merely states that overdrafts will be covered by a transfer of funds from a member's savings account if there are "sufficient funds on

8

deposit" in the savings account. It does not even refer to the checking account balance. In any event, "sufficient funds on deposit" in a savings account can and should be read consistently with the language in the rest of the Agreement to mean funds that are "available."

Plaintiff also contends that the contract must be construed to require use of the ledger balance because "[n]owhere in the agreement is the term 'available balance' or the term 'available funds' defined." *See* Compl., ¶ 25. That argument is meritless. The fact that the Membership Agreement does not contain a glossary of all the English words used is not determinative. "Where the wording of a contract is unambiguous, the contract must be enforced according to its terms." *BayBank Middlesex*, 760 F. Supp. at 963. Here, the Membership Agreement states that "available balance" will be used to determine overdrafts. There is no justification for construing that language to mean "all of the funds" in an account as Plaintiff asks this Court to do. *See* Compl. 36. If "available balance" meant all of the funds in an account, there would be no need to use the modifier "available." *See Chambers*, 222 F. Supp. 3d at 11 (rejecting argument that "available" balance means "actual" balance). "Available balance" is a well-known banking term that has long been understood to mean the money in an account minus holds placed on funds to account for uncollected deposits and for pending debit transactions. *See Tims*, 2017 WL 5133230, at *1; *see also infra*, p. 3. Because Plaintiff's interpretation of the Membership Agreement is unreasonable and contrary to the plain meaning of the text, it should be rejected as a matter of law.

2. **Plaintiff's Interpretation Fails Because It Would Render Much Of The Membership Agreement Meaningless.**

It is well settled that a contract must "be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its overall purpose." *BayBank Middlesex*, 760 F. Supp. at 963 (citations omitted); *see also Raytheon Co. v. Donovan*, 208 F. Supp. 2d 99, 105 (D.

9

Mass. 2002) ("a document should be read to give effect to all its provisions and to render them consistent with one another") (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)).  Thus, a contract must not, whenever possible, be construed so as to render any of its terms meaningless." *BayBank Middlesex*, 760 F. Supp. at 963 (citation omitted); *see also FDIC v. Singh*, 977 F.2d 18, 22 (1st Cir. 1992); *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 370 (D. Mass. 1991) ("In construing a contract, a court must give reasonable effect to each provision, and the contract must be viewed as a coherent whole.").

Interpreting the Membership Agreement to mean overdraft fees will be assessed on available balance as opposed to ledger balance is the only plausible interpretation that gives effect to the entire contract without contradictions. The Digital Funds Availability Policy determines how much of a deposit will be available for a member.  Compl., Ex. 1, pp. 29-31.  If, as Plaintiff claims, Digital may not consider the funds on hold when paying a transaction (*see* Compl., ¶ 26), Digital's Funds Availability Policy is rendered a nullity because the holds on deposits will have no impact on whether a member may spend the full amount without overdrawing.  A contract interpretation rendering this much of the contract meaningless or nonsensical is not plausible.

An example is illustrative:  If a member makes a $10,000 deposit with an out-of-state check, her available balance will be $200 and her ledger balance will be $10,000 until the deposit hold is released.  According to Plaintiff (and contrary to the Funds Availability Policy), the member may spend the full $10,000 immediately without overdrawing.  That is how Plaintiff's construction of the contract nullifies an essential component of the Membership Agreement and fails to avoid internal contradictions.  *See Chambers*, 222 F. Supp. 3d at 11 ("It is true that the agreements do not contain a comprehensive definition of the available balance.  But in the

"Funds Availability Disclosure," which "describes [the customer's] ability to withdraw funds . . . the Credit Union makes clear that not every dollar in a customer's account is immediately 'available' for withdrawal."); *Tims*, 2017 WL 5133230, at *5 ("Although the Plaintiff's interpretation may be persuasive or reasonable when certain clauses are viewed in isolation, they lead to conflict and absurdity when viewing the agreements as a whole.").[2]

Because the only reasonable reading of the contract read as a whole is that the available balance – and not the ledger balance – is used to determine overdrafts, Plaintiff's contract claims must be rejected as a matter of law. *See Tims*, 2017 WL 5133230, at *4 (dismissing breach of contract claim where "the most harmonious and natural reading of the Account Agreement, when considering all of its sections in context, leads to the use of the available balance method, not the ledger balance method"); *Chambers*, 222 F. Supp. 3d at 12-13 (dismissing similar claim where "the relevant agreements unambiguously convey[ed] that the Credit Union will impose overdraft fees on debit transactions that overdraw the available balance").

### 3. There Was No Separate Breach Of The Opt-in Form.

Regulation E provides that before a financial institution can "assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service," it must give consumers an opt-in form that includes, among other things, a brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed.  12 C.F.R.

---

[2] Although Plaintiff's principal position is that Digital "could only charge an overdraft fee if the balance in the account became negative without regard to *any deductions for holds on deposits, or any other holds*" (Compl., ¶ 26), Plaintiff proffers another construction that would allow Digital to deduct for "holds on recently deposited, *i.e.*, uncollected, funds in the account" (*id.*). As the CFPB has explained, *see Tims,* 2017 WL 5133230, at *1 n.5, and the Federal Reserve has repeatedly acknowledged, *see infra*, p. 3, however, the longstanding term "available balance" deducts funds held for both pending debit transactions and for uncollected deposits.

135389307v1

§ 205.17(b)(1).  To implement this rule, the Federal Reserve created a one-page Model Form (developed after several rounds of consumer comprehension testing, *see* 74 Fed. Reg. at 59036). *See* 12 C.F.R. § 1005, App. A  ("A-9 Model Consent Form for Overdraft Services § 1005.17"). Regulation E requires that the notice provided by financial institutions "shall be substantially similar to Model Form A-9."  *See* 12 C.F.R. § 1005.17(d).  Digital's Opt-in Form closely tracks the Model Form.  *See* Compl., Ex. 2.

Plaintiff claims that the Digital Opt-in Form promised that Digital will use the ledger balance to assess overdrafts by stating that an overdraft occurs "when you do not have enough money in your checking account . . . ."  Compl., ¶ 27; *see also* Compl., Ex. 2.  Plaintiff is wrong.

*First*, the phrase "enough money" is clearly broad enough to mean "available" money. The word "enough" means "occurring in such quantity, quality, or scope as to fully meet demands, needs, or expectations."   Merriam-Webster.com Dictionary, "enough," accessed May 30, 2018, https://www.merriam-webster.com/dictionary/enough.  No reasonable consumer would expect that if she had no money available to use that she would have an amount "to fully meet her demands, needs, or expectations."

*Second*, the Opt-in Form must be read in conjunction with the Membership Agreement. When an agreement between the parties is contained in more than one document, the separate documents "must be read together to effectuate the intentions of the parties."  *Chase Commercial Corp. v. Owen*, 32 Mass. App. Ct. 248, 250 (1992) (citations omitted); *see also Singh*, 977 F.2d at 21 ("Under Massachusetts law, when several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together") (citations omitted); *Consolo v. Bank of America*, No. 15-11840, 2017 WL 1739171, at * 3 n.3 (D. Mass. May 2, 2017) ("documents must be read together when they are close in temporal space and are 'closely

135389307v1

interrelated'") (citation omitted); *Finamore v. Garcia*, No. 06-11855-RBC, 2011 WL 13244945, at *5 (D. Mass. Dec. 8, 2011) at *5 ("the intent of the parties must be determined from all the instruments read together") (citations omitted).

When read together with the Membership Agreement, it is clear that the "enough money" language of the Opt-in Form must be construed to mean the "available balance" method set forth in the Membership Agreement. The Opt-in Form expressly states that it applies to the "Standard Overdraft Practices that come with your account." *See* Compl., Ex. 2. The "Standard Overdraft Practices" that "come with [a member's] account" are set forth in the Membership Agreement and (as explained above) explicitly provide that overdrafts are assessed on the "available balance." Accordingly, when construed together with the Membership Agreement, the "enough money" language in the Opt-in Form can and must be read to mean "available balance." *See, e.g.*, *Tims*, 2017 WL 5133230, at *6 (interpreting similar opt-in form and holding that because "enough money" can mean the available balance method, the credit union cannot be said to have inaccurately described its overdraft program).

*Third*, Plaintiff's contention that "enough money" in the Opt-in Form must mean ledger balance is belied by the Federal Reserve Board's knowledge and expectation that financial institutions commonly determine overdrafts on the basis of the available balance. Indeed, Regulation E itself contemplates that an overdraft will occur if the member lacks funds available to cover a transaction. *See* 12 C.F.R. § 205.17 (A financial institution may assess "a fee or charge on a consumer's account held by the institution for paying a transaction (including a check or other item) when the consumer has *insufficient or unavailable* funds in the account.") (emphasis added); *see also* Regulation E Final Rule, 74 F.R. 59033-01 (Nov. 17, 2009) ("[U]nder network rules, financial institutions must pay authorized debit card transactions, even

if at settlement intervening transactions by the consumer have reduced the consumer's *available balance* below the authorized amount of the transaction" and "institutions may debit the consumer's account for the amount of *the overdraft*") (emphasis added).[3]

The Federal Reserve Board's understanding is also demonstrated by its rejection of a proposed rule that would have placed limits on overdraft fees caused by debit holds. In its explanation of the final Opt-in Rule, the Board notes that it considered a proposal "to prohibit institutions from assessing an overdraft fee where the overdraft would not have occurred but for a *debit hold placed on funds* in an amount that exceeds the actual transaction amount and where the merchant could determine the actual transaction amount within a short period of time after authorization of the transaction" (unless "the institution adopted procedures designed to release the hold within a reasonable period of time"). *See* 74 Fed. Reg. 59049 (emphasis added). The Board explained that it declined to adopt that proposal because, among other things, it was "persuaded that addressing *overdrafts caused by debit holds* raises significant operational issues." *See* 74 Fed. Reg. 59049-50 (emphasis added).

Accordingly, the Federal Reserve has always recognized – both before and after the adoption of the Opt-in Rule and creation of the Model Form – that financial institutions typically do and may impose overdraft fees based on the available balance in a customer's account, including fees for "*overdrafts caused by debit holds*." 74 Fed. Reg. 59049. Given that

---

[3] Regulation DD's overdraft disclosure rule further reveals this assumption. *See* 12 C.F.R. § 1030.11 ("Additional disclosure requirements for overdraft services"). The official interpretation of that rule specifically explains that for balances disclosed to consumers through automated systems, a financial institution "may, but *need not*" include funds that are "held by the institution to satisfy a prior obligation of the consumer (for example, *to cover a hold for an ATM or debit card transaction that has been authorized but for which the bank has not settled*)." 12 C.F.R. § 1030.11(c), Official Staff Interpretation (emphasis added).

understanding, the "enough money" language in the Model Form must be construed "as is" to encompass fees based on the "available balance."

**B.    Plaintiff's EFTA Claim Fails As A Matter Of Law.**

1.    **Plaintiff's EFTA Claim Fails On The Merits.**

Plaintiff's claim that the Digital Opt-in Form violates Regulation E is based solely on the theory that the form's "enough money" language promised that Digital would use the "ledger balance" method to determine overdrafts. *See* Compl. ¶ 27 ("Because the Opt-In Contract does not describe [Digital's] actual overdraft service, [it] fails to comply with the requirements of Regulation E"). But as explained above, when read in conjunction with the Membership Agreement (as it must be), the Opt-in Form accurately describes Digital's overdraft service.

Even if the Court were to find that the "enough money" language of the Opt-in Form means ledger balance (and that is clearly not what was intended by Digital or the Federal Reserve Board), Digital is protected from liability under the EFTA's safe harbor provision. As the court explained in *Tims*, that provision "states that no liability shall be imposed for 'any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board.'" 2017 WL 5133230, at *7 (citing 15 U.S.C. § 1693m(d)(2)). Here, because Digital used the Model Form as its Opt-in Form, it cannot and should not be liable under the EFTA. *Id.* Accordingly, Plaintiff's claim for violations of Regulation E must be dismissed.[4]

---

[4] What is more, any imposition of liability based on a construction of the Model Form to mean solely to ledger balance would violate due process in light of the federal government's failure to provide fair notice. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) ("Petitioners invoke the DOL's interpretation of ambiguous regulations to impose potentially massive liability on respondent for conduct that occurred well before that interpretation was announced. To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'") (citation omitted).

135389307v1

### 2. **Plaintiff's EFTA Claim Is Time-Barred.**

Plaintiff's EFTA claim is also time-barred under EFTA's one-year statute of limitations. *See* 15 U.S.C. § 1693m(g) ("any action under this section may be brought . . . within one year from the date of the occurrence of the violation"). Plaintiff alleges she was charged improper overdraft fees on December 18, 2014 and on December 19, 2014 (Compl., ¶ 38) but she did not file the Complaint until June 15, 2018 – more than three years later. Numerous courts have held that an EFTA claim accrues as soon as the first fee is charged because the claim is rooted in a single wrongful omission: "failing to obtain written authorization for the series of transfers that were agreed upon and to provide a copy to the consumer." *Repay v. Bank of Am.*, *N.A.*, No. 12-10228, 2013 WL 6224641, at *4 (N.D. Ill. Nov. 27, 2013). The first transfer therefore not only triggers the one year limitations period as to that transfer, "but it also triggers the limitations period for all ensuing transfers." *Harvey v. Google Inc.*, No. 15-CV-03590-EMC, 2015 WL 9268125, at *3 (N.D. Cal. Dec. 21, 2015); *accord Whittington v. Mobileoil Federal Credit Union*, No. 16-cv-482, 2017 WL 6988193, at *12-13 (E.D. Tex. Sept. 14, 2017) ("[T]he date of the first noncompliant transfer out of a series of transfers . . . begin[s] the running of the limitations period.").

Because Plaintiff alleges that she was assessed an "unlawful transfer" on December 18, 2014, her EFTA claim accrued no later than that date. *See, e.g.*, *Whittington*, 2017 WL 6988193, at *13 (EFTA claim arising out of overdraft fees accrues when the defendant first "assessed a purportedly improper overdraft fee"); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 350 (D.N.H. 2018) ("All but one of the courts that have considered the EFTA statute of limitations have concluded that the limitation period is triggered when a financial institution makes a first unauthorized transfer or a fee assessment is paid."); *Repay*, 2013 WL 6224641, at *4; *Harvey*, 2015 WL 9268125, at *4 (statute of limitations accrues with first transfer and "the

16

fact that other transfers occurred within the limitations period does not save the EFTA claim");

*Camacho v. JPMorgan Chase Bank*, Case No. 5:14-CV-04048-EJD, 2015 WL 5262022, *4 (N.D. Cal. Sept. 9, 2015); *Pelletier v. Pac. WebWorks, Inc.*, No. CIV S-09-3503 KJM KJN, 2012 WL 43281, *6 (E.D. Cal. 2012); *Wike v. Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009).

To be sure, *Diviacchi v. Affinion Group, Inc.*, No. 14-10283-IT, 2015 WL 3631605, at *10 (D. Mass. Mar. 11, 2015), appears to challenge the proposition that the EFTA statute of limitations begins to run with the inception of the first unlawful transfer and does not begin anew with each transfer. However, *Diviacchi* is distinguishable because it involved, not simply a single wrongful omission as in this case – the failure to obtain written authorization for a series of transfers agreed upon by the consumer – but also a failure to obtain a verbal authorization. The *Diviacchi* court deliberately distinguished the *Repay* case based on this important fact: "[*Repay*] is also distinguishable because in the case at bar [defendant bank] purportedly never obtained not only a valid written authorization but also never obtained a verbal authorization." 2015 WL 3631605, at *8. As one court explained, *Diviacchi* is considered a "minority view" that most courts have found "not persuasive" because "[a]lthough the consumer is financially injured with each transfer, the basis of the wrongful conduct is the failure to obtain proper authorization in the first instance." *Harvey*, 2015 WL 9268125, at *4 n.1.[5]

---

[5] The recent case of *Pingston-Poling v. Advia Credit Union*, No. 1:15-CV-1208, 2018 WL 3758088 (W.D. Mich. Aug. 8, 2018), is based on similarly faulty reasoning. There, the court found that preauthorized recurring transfers merit a different rule than non-recurring overdraft fees because "[i]n the first instances, a consumer gives express permission for a series of recurring transfers from his or her account" and "in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee or charge, let alone a series of them." *Id.* at *3 (internal quotation marks omitted; citing *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2018 WL 1662107, at *5 (D. Haw. Apr. 5, 2018)). Contrary to the reasoning of *Pinston-Poling and Smith*, there is no basis for distinguishing between claims challenging the failure to obtain written authorization for recurring transfers and the failure to obtain written authorization to charge overdraft fees. In both

To the extent Plaintiff argues the discovery rule can save her EFTA claim, no court has ever tolled the EFTA statute of limitations based on the discovery rule, likely because the injury is immediately discoverable based on account statements. *See Dorsey v. Enterprise Leasing*, 78 F. Supp. 3d 353, 357 (D.D.C. 2015) ("it is unclear whether the one-year statute of limitations of the EFTA incorporates a discovery rule"); *Harvey*, 2015 WL 9268125 at *4 (dismissing EFTA claim on statute of limitations grounds because even if the discovery rule applied, "[i]f Harvey had exercised due diligence, she should have discovered the injury either by looking at her Google account or even more simply, looking at her bank statements"); *Walbridge*, 299 F. Supp. 3d at 350 ("In the context of EFTA claims, courts have found that the discovery rule does not apply because a plaintiff could reasonably discover an injury by reviewing his bank statement or online account which would show that a fee or fees had been improperly assessed."). Thus, there is no basis for the discovery rule to toll the statute of limitations.

Furthermore, even if the discovery rule were to apply, the Court cannot apply it here because Plaintiff makes no allegations invoking it in the Complaint. *E.g.*, *Quality Cleaning Products R.C. v. SCA Tissue North Am.*, 794 F. 3d 200, 207 fn. 4 (1st Cir. 2015) ("[E]ven those courts that do not require a plaintiff to explicitly reference the discovery rule by name in the complaint note that a plaintiff must plead some facts 'sufficient to give notice of its reliance on the discovery rule.'"); *Ramirez v. Baxter Credit Union*, No. 16-cv-03765-SI, 2017 WL 1064991, at *8 (N.D. Cal. Mar. 21, 2017) (holding in a similar Regulation E case that the "proposed [six-year] class period dating back to August 15, 2010 for a cause of action with a one-year

---

cases, the wrong is the failure to obtain a single written authorization for a series of future charges. And in both cases, the action is complete when the first unauthorized transfer occurs. *See Walbridge*, 299 F. Supp. 3d at 350; *Whittington*, 2017 WL 6988193, at *13.

limitations period is facially invalid, absent any allegations which would extend the one-year period by discovery").

### C. Plaintiff's Claim For Breach Of The Implied Covenant Of Good Faith Fails To State A Claim

Under Massachusetts law, the implied covenant of good faith arises out of a contract between parties, but does not create rights or duties beyond those the parties agreed to when they entered into the contract. *See Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005). Rather, the covenant ensures that the parties act in good faith so that neither does "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Curtis v. Herb Chambers I–95, Inc.*, 458 Mass. 674, 680 (2011) (citation omitted).

Because the parties' contract does not require use of the ledger balance to assess overdrafts, Plaintiff does not and cannot state a claim for breach of the implied covenant of good faith. *See Tims*, 2017 WL 5133230, at *5 (dismissing implied covenant of good faith claim where the contract permitted use of the available balance method; "there can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do") (citation omitted).

### D. Plaintiff's Claims For Unjust Enrichment And Money Had And Received Should Be Dismissed Because A Written Contract Governs the Same Subject Matter.

Unjust enrichment and money had and received are equitable causes of action which are available to plaintiffs who lack adequate remedies at law. *See Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp. 2d 23, 29 (D. Mass. 2006) (citing *Stone v. White*, 301 U.S. 532, 534 (1937)). Neither cause of action applies when the parties' relationship is governed by an express contract. *See Ruiz*, 447 F. Supp. 2d at 29 (because "a valid, express contract governed the

relationship between Ruiz and defendants, plaintiff's claims for unjust enrichment and money had and received will be dismissed") (citation omitted). Thus, these claims fail because there is a binding enforceable contract between the parties.

## IV.    CONCLUSION.

The Digital Membership Agreement and Opt-in Form do not state overdrafts will be assessed based on the ledger balance in Plaintiff's account and neither document can be construed to create that obligation. In addition, Plaintiff's EFTA claim is time barred. Accordingly, Digital respectfully requests dismissal of the entire Complaint without leave to amend.

Dated this 7th day of September, 2018.

Respectfully Submitted,

**KATTEN MUCHIN ROSENMAN LLP**

/s/ Stuart M. Richter
Stuart M. Richter (pro hac vice)
Andrew J. Demko (pro hac vice)
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: 310.788.4400
Fax: 310.788.4471
Email: stuart.richter@kattenlaw.com
andrew.demko@kattenlaw.com

CHRISTOPHER, HAYS, WOJCIK & MAVRICOS, LLP

John A. Mavricos
446 Main Street, Eighth Floor
Worcester, MA 01608
Telephone: 508.792.2800 ext. 230
Fax: 508.792.6224
Email: jmavricos@chwmlaw.com

Attorneys for Defendant, Digital Federal Credit Union

135389307v1

## CERTIFICATE OF SERVICE

I, Stuart M. Richter, hereby certify that on the 7th day of September, 2018, the foregoing document, filed through the CM/ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/* Stuart M. Richter

135389307v1