UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRANDI SALLS, individually, and on behalf of all others similarly situated | ) ) ) ) | CIVIL ACTION |
| Plaintiff, | ) ) | NO. 18-11262-TSH |
| v. | ) ) | |
| DIGITAL FEDERAL CREDIT UNION and DOES 1 through 100, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS
(Docket No. 12)

**November 8, 2018**

**HILLMAN, D.J.**

Brandi Salls ("Plaintiff") brings a putative class action challenging the practice of Digital Federal Credit Union and DOES 1 through 100 ("Defendant") to charge overdraft fees when members accounts have sufficient funds to cover the transactions. She brings claims for breach of contract (Counts I and II), breach of the implied duty of good faith and fair dealing (Count III), unjust enrichment (Count IV), money had and received (Count V), and violation of Regulation E, 12 C.F.R. § 1005.17, of the Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.* (Count VI). Defendant moves to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (Docket No. 12). For the reasons stated below, Defendants motion is ***granted*** in part and ***denied*** in part.

## Background

The following facts are taken from Plaintiff's complaint (Docket No. 1) and assumed to be true for the purposes of this motion. The court also may consider "matters fairly incorporated within [the complaint] and matters susceptible to judicial notice." *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003). Accordingly, the Court will also consider models of the two agreements that Plaintiff entered into with Defendant. (Docket Nos. 23-1; 23-2).[1]

Plaintiff is a member of and entered into two written contracts with Defendant. The first agreement ("Account Agreement") states, in relevant part:

- All accounts are subject to your *Schedule of Fees and Service Charges*. You shall debit such charges against any account I own except my IRA. If there are insufficient funds available, the charges are payable on demand and, for checking accounts, will be treated as an overdraft. Docket No. 23-1 at 7 (emphasis in original).
- You may at your discretion, but are not obligated to nor shall you be liable for refusal to, pay funds from this account: When such payment would draw the available balance in the account below the minimum balance for the account as established from time to time by you (overdraft—See the *Schedule of Fees and Service Charges*). This may include overdraft fees created by checks, debit card, ACH, and other electric means as applicable. *Id.* at 17 (emphasis in original).

The second agreement ("Opt In Agreement") describes Defendant's overdraft policies as required by Regulation E of EFTA. 12 C.F.R. § 1005.17. The Opt In Agreement provides: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." (Docket No. 24-2 at 4).

---

[1] Plaintiff has quoted and referenced both agreements in her complaint. She has also requested that this Court take judicial notice of the them and Defendant has not objected to their authenticity. Therefore, I will consider both documents at this stage. *See Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trail court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

Plaintiff's claims in this case arise from overdraft fees based on the "available balance" as opposed to the "ledger" or "actual balance." The "available balance" of an account is calculated by deducting pending debits and deposit holds. Therefore, the "available balance" can be much lower than the "actual balance" in an account.

Plaintiff alleges that on December 18, 2014, December 19, 2014, and on information and belief at least one time within twelve months of filing her complaint, she was charged an overdraft fee when her "actual balance" was enough to cover the transaction. Because her "available balance" was insufficient, however, she was charged an overdraft fee.

## **Standard of Review**

A defendant may move to dismiss, based solely on the complaint, for the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559, 127 S.Ct. 1955 (2007). Although detailed factual allegations are not necessary to survive a motion to dismiss, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011).

In evaluating a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 68 (1st Cir. 2000). It is a "context-specific task" to determine "whether a complaint states a plausible claim for relief," one that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129

S.Ct. 1937 (2009) (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). On the other hand, a court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

## Discussion

### *1.     Breach of Contract*

"It is well-settled under Massachusetts law that the interpretation of a contract is generally a question of law." *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991) (citations omitted). If a contract is unambiguous, it must be enforced according to its plain terms. *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786 (1970). If it is ambiguous, however, its interpretation is a question of fact for the jury. *Gillentine v. McKeand*, 426 F.2d 717, 721 (1st Cir. 1970); *Trafton v. Custeau*, 338 Mass. 305, 307-08, 155 N.E.2d 159 (1959). "The determination of whether the terms of a contract are ambiguous is a question of law." *Baybank*, 760 F. Supp. at 963. Terms will be found ambiguous only when they "are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989).

When an agreement between the parties is contained in more than one document, the separate documents "must be read together to effectuate the intentions of the parties." *Chase Commercial Corp. v. Owen*, 32 Mass. App. Ct. 248, 250 (1992) (citations omitted); *see also Singh*, 977 F.2d at 21 ("Under Massachusetts law, when several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together.") (citations omitted);

4

*Consolo v. Bank of America*, 2017 WL 1739171, at *3 n.3 (D. Mass. May 2, 2017) ("documents must be read together when they are close in temporal space and are closely interrelated.") (quotation marks and citation omitted).

Here "[a]lthough the Agreements are separate, they are arguably linked with respect to an account holder's overdraft protection." *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 344 (D.N.H. 2018); *see also Smith v. Bank of Hawaii*, 2017 WL 3597522, at *5-6, (D. Haw. Apr. 13, 2017) (similarly construing an overdraft agreement and account agreement together as part of the same transaction). *But see Advia*, 227 F. Supp. 3d 848, 856 (W.D. Mich. 2016) (finding that "the Op-in Agreement is a separate contract."). Because "Plaintiff[] ha[s] not laid out any facts supporting the inference" that the agreements should not be construed together even though they are arguably linked with respect to overdraft protection, I will consider the overdraft agreement in the context of the Account Agreement for the purposes of this motion. *Harrington v. Tetraphase Pharm. Inc.*, 2017 WL 1946305, at *4 (D. Mass. May 9, 2017).[2]

Members opt in to Defendant's overdraft service by checking a box on their checking and savings account application. (Docket No. 24-2 at 3). The Opt In Agreement is accompanied by an overdraft disclosure form. (Docket No. 24-2 at 4). The disclosure provides, in relevant part: "An overdraft occurs when you <u>do not have enough money in your account to cover the transaction</u>, but we pay it anyway." *Id.* (emphasis added). The overdraft disclosure does not provide any information clarifying that "enough money" is to be construed as "available balance" and therefore

---

[2] Massachusetts law requires documents to be "read together when they are close in temporal space." *See Consolo*, 2017 WL 1739171, at *3 n.3. Here, however, the documents Plaintiff submitted to the Court are not dated, and Plaintiff does not provide the date of the Opt-In Agreement in her complaint. Thus, the factual issue remains as to whether the agreements were entered in a sufficiently close temporal space as to require being read together. *See Walbridge*, 299 F. Supp. 3d at 344 n. 3 (construing the Opt-In and Account Agreements together for the purposes of the motion to dismiss despite the remaining "factual question as to when the agreements were signed and in what sequence.").

I find that a reasonable person could construe "enough money" to mean "ledger balance." *See Walbridge*, 299 F. Supp. 3d at 343 ("Standing alone, the Opt In Agreement does not sufficiently define or explain the term 'enough money' to put account holders on notice that 'enough money' means available balance."). *Cf. Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 10 (D.D.C. 2016) (finding an opt in agreement unambiguously referring to "available balance" where it "specifically invoke[ed] the phrase 'available balance'" and provided examples to demonstrate what not "enough money in your account to cover a transaction" meant).

Defendant argues, however, that reading the Opt In Agreement in conjunction with the Account Agreement provides context that lends support to its arguments. The Account Agreement does indeed include references to available funds and overdrafts. Most relevant here:

- All accounts are subject to your *Schedule of Fees and Service Charges*. You shall debit such charges against any account I own except my IRA. If there are insufficient funds available, the charges are payable on demand and, for checking accounts, will be treated as an overdraft. Docket No. 23-1 at 7 (emphasis in original).
- You may at your discretion, but are not obligated to nor shall you be liable for refusal to, pay funds from this account: When such payment would draw the available balance in the account below the minimum balance for the account as established from time to time by you (overdraft—See the *Schedule of Fees and Service Charges*). This may include overdraft fees created by checks, debit card, ACH, and other electric means as applicable. *Id.* at 17 (emphasis in original).

Defendant argues that these passages clearly demonstrate that the overdraft service utilizes members' "available balance." Defendant next contends that "'[a]vailable balance' is a well-known banking term that has long been understood to mean the money in an account minus holds placed on funds to account for uncollected deposits and for pending debit transactions." (Docket No. 13 at 9). Finally, Defendant argues that The Funds Availability Policy in the Account Agreement provides explicit guidance for members of various scenarios in which funds will not be immediately "available." *Id.* at 16-17.

6

For two reasons Defendant's argument fails. First, Defendant did not properly define "available balance" and its meaning is therefore ambiguous. Plaintiff contends that her account balance was artificially low not only because there was a hold placed on deposits into her account but also because Defendant subtracted pending transactions from the ledger balance. Indeed, this is how Defendant calculates "available balance." Nowhere, however, does the Funds Availability Policy mention this second scenario or clarify how it might affect a member's balance. Instead, the Funds Availability Policy only explains how there may be a delay on funds coming into a member's account. Despite not sufficiently defining the term, Defendant argues that "available balance" nonetheless a well-known term that reasonable members would understand. I find, however, that the meaning of the term as used in the Account Agreement is ambiguous. Indeed, several courts, have found similar contractual arraignments ambiguous when they used the term "available balance." *See, e.g.*, *Ramirez v. Baxter Credit Union*, 2017 WL 1064991, at \*5 (N.D. Cal. Mar. 21, 2017) ("Plaintiff reasonably asserts that the agreement fails to define 'available balance,' or otherwise clearly indicate to a customer that her 'available balance' is somehow different from her ledger balance."); *Walbridge*, 299 F. Supp. 3d at 346 ("The terms Northeast used, in the absence of clear definitions or explanations, could reasonably be understood to mean the actual balance, as other courts have found.").

Second, even if it was clear that Defendant subtracted pending transactions to calculate "available balance," neither of the Account Agreement sections pertaining to over-drafting nor the Opt In Agreement refer members to the Funds Availability Policy to find explanations of how their balance is calculated for purposes of overdrafts. Likewise, the Funds Availability policy makes no reference of how it might be related to overdrafts. Thus, it is not at all clear that Defendant would use the "available balance" when determining if an account was overdrawn even if that term

were defined adequately. *See Smith*, 2017 WL 3597522, at *6 ("Although the Account Agreement has sporadic references to 'available' funds or balances, there is no statement, clearly understood by a reasonable customer, that BOH would use the available balance method when determining if an account was overdrawn."); *Walbridge*, 299 F. Supp. 3d at 346 ("the agreements here are long, twenty-four pages in total, and Northeast relies on scattered references to available funds while using other terms that it does not define.").

Therefore, I find that Plaintiff has plausibly argued that the contracts, even when construed together, are ambiguous as to whether they use the "available balance" method to determine whether an account has been overdrafted. This ambiguity presents a factual dispute not appropriate for resolution on this motion. Accordingly, Plaintiff's breach of contract claim survives Defendant's motion to dismiss.

*2. Breach of the Implied Covenant of Good Faith and Fair Dealing*

Under Massachusetts law, a plaintiff states a claim for breach of the covenant of good faith and fair dealing "when one party violates the reasonable expectations of the other." *Robert and Ardis James Foundation v. Meyers*, 474 Mass. 181, 188 (2016). For the reasons stated above, I find that a reasonable person could have construed the contracts to mean that Defendant would use the ledger balance method when calculating overdrafting fees. Thus, Plaintiff plausibly states a claim that her reasonable expectations were violated, and that Defendant therefore breached the implied covenant.

*3. Unjust Enrichment and Money Had and Received*

Defendant argues that because a contractual relationship exists, there can be no claims for unjust enrichment and money had and received. Defendant is correct that "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." *Platten v.*

8

*HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006); *see also Zarum v. Brass Mill Materials Corp.*, 334 Mass. 81, 134 N.E.2d 141, 143 (1956) ("The law will not imply a contract where there is an existing express contract covering the same subject matter."); *Metropolitan Life Ins. Co. v. Cotter*, 464 Mass. 623, 641 (2013) ("Ordinarily, a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties.") (quotation marks and citations omitted).

While Defendant is correct that damages for breach of contract and the equitable claims are mutually exclusive, the First Circuit in *Lass v. Bank of America, N.A.* noted that "it is accepted practice to pursue both theories at the pleading stage." 695 F.3d 129 (1st Cir. 2012); *see also Viera v. First American Title Ins. Co.*, 668 F. Supp. 2d 282, 295 (D. Mass. 2009) (Plaintiff may "plead alternative and even inconsistent legal theories, such as breach of contract and unjust enrichment, even if Plaintiffs only can recover under one of these theories."). In *Lass*, the First Circuit permitted equitable claims to survive a motion to dismiss when the contract at issue did "not explicitly address" some of the claims made by the plaintiff in that case. *Lass*, 695 F.3d 129, 140; *see also Metropolitan Life*, 464 Mass. at 641 (holding that a plaintiff is only entitled to pursue equitable claims "in circumstances where one party to a contract demands performance from the other that is not due under the terms of the contract."). Therefore, the court held that "the district court will be in a better position once the record is more developed to determine whether the unjust enrichment claim should survive." *Lass*, 695 F.3d at 141.

Here, Plaintiff asserts that she entered into binding contracts with Defendant and uses the same theories to support both her breach of contract and equitable claims. Thus, unlike the situation in *Lass*, the contractual arrangement between the parties here does explicitly cover the dispute. Plaintiff does not allege that Defendant was enriched because it received a benefit outside

the scope of the contracts between the parties. Rather, Plaintiff alleges that the benefit was conferred upon Defendant because it breached the contract. As such, Plaintiffs equitable claims must fail. *See Walbridge*, 299 F. Supp. 3d at 347 (holding that "[a]lthough incompatible claims might be allowed to proceed at the pleading stage in some cases," because the plaintiff "brings claims for breach based on the same theory that he asserts in support of his equitable claims . . . it is appropriate to dismiss the claims.").

### 4. EFTA

#### a. Violation of Regulation E

Plaintiff alleges Defendant violated Regulation E of EFTA, 12 C.F.R. § 1005.1 *et seq.*, because it did not accurately describe its overdrafting practices in the Opt-In Agreement. Regulation E provides, in relevant part:

> [A] financial institution ... shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:
>
> (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service;
>
> (ii) Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card transactions;
>
> (iii) Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and
>
> (iv) Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees electronically, which includes a statement informing the consumer of the right to revoke such consent.

C.F.R. § 1005.17(b). Further, the mandated disclosure must "be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1).

Defendant's Opt In Agreement states that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction." (Docket No. 24-2 at 4). Plaintiff argues that this description does not accurately describe Defendant's practice. (Docket No. 25 at 16). Defendant contends that when read in conjunction with the Agreement, the Opt-In Agreement sufficiently and accurately describes Defendant's policies. For the reasons stated above in the context of the breach of contract claim, the language Defendant uses is ambiguous. Therefore, I do not find that "enough money" accurately describes Defendant's policy of using the "available balance" method such that a member could meaningfully provide affirmative consent.

### b. Defenses

#### i. Safe Harbor

Defendant alternatively argues that it is protected from liability under the EFTA safe harbor provision. Financial institutions are protected from liability under EFTA for "any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board." 15 U.S.C. § 1693m(d)(2).

Defendant relies on *Tims v. LGE Community Credit Union*, 2017 WL 5133230 (N.D. Ga. Nov. 6, 2017). The court in that case found that the safe harbor provision applied because "'enough money' could mean either balance calculation method." *Id.* at *6. Therefore, the court held that "LGE cannot be said to have explicitly misled the Plaintiff or inaccurately described its overdraft program. The only thing LGE can be said to be guilty of is a lack of precision." *Id.*

Other courts, however, have been critical of the *Tims* holding. *See, e.g.*, *Walbridge*, 299 F. Supp. 3d at 349 ("The reasoning in *Tims* is strained at best and, therefore, not persuasive."). Indeed, most courts have interpreted the safe provision as precluding liability for violations arising from the form notice takes but not from misleading or inaccurate content it includes. *Walbridge*,

299 F. Supp. 3d at 349; *Gunter v. United Federal Credit Union*, 2017 WL 4274196, at *4 (D. Nev. Sept. 25, 2017); *Pinkston-Polling v. Advia Credit Union*, 2017 WL 5153218, at *2 (W.D. Mich. Apr. 20, 2017); *Smith*, 2017 WL 3597522, at *8; *Walters v. Target Corp.*, 2017 WL 3721433, at *5 (S.D. Cal. Feb. 14, 2017); *Ramirez v. Baxter Credit Union*, 2017 WL 118859, at *7 (N.D. Cal. Jan. 12, 2017); *Berenson v. Nat'l Fin. Servs., LLC*, 403 F. Supp. 2d 133, 151 (D. Mass 2006). I agree that the reasoning in *Tims* is unpersuasive and hold that the safe harbor does not protect Defendant from liability in this case.

### ii. Statute of Limitations

Individual and class actions for damages for failure to comply with the EFTA may be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. 1693m(g). According to Plaintiff, she was wrongly charged overdraft fees on December 18, 2014, December 19, 2014, and upon information and belief at least one other time within twelve months of filing her complaint on June 15, 2018.

### 1. Claims from June 15, 2017 to Present

Defendant contends that Plaintiff's claim accrued "as soon as the first fee [was] charged." (Docket No. 13 at 16). None of the Circuit Courts have directly addressed this issue. In *Wike v. Vertrue, Inc.*, 566 F.3d 590, 591-92 (6th Cir. 2009), a cardholder verbally preauthorized monthly charges to a debit card. The Sixth Circuit concluded that "the one-year limitations period began when the first recurring transfer took place." *Id.* at 593. All the transfers at issue in that case, however, were made within the one-year period. As a result, the court did not determine whether, had the first transfer been made outside that period, all claims based on later transfers would have been barred.

Some district courts have interpreted *Wike* to stand for the proposition that a pre-authorized transfer made outside of the one-year window bars all later claims. *See, e.g.*, *Repay v. Bank of Am, N.A.*, 2013 WL 6224641, at *3 (N.D. Ill. Nov. 27, 2013) (concluding the first transfer "also triggers the limitations period for all ensuring transfers."); *Harvey v. Google Inc.*, 2015 WL 9268125, at *4 (N.D. Cal Dec. 21, 2015) (same). *But see Diviacchi v. Affinion Grp., Inc.*, 2015 WL 3631605, at *10 (D. Mass. March 11, 2015) (holding that each transfer "constitutes a new and independent violation" this is actionable if it falls within the one-year limitation period regardless of whether earlier transfers fell outside the window). Defendant relies heavily on the *Wike* progeny to argue that the clock on Plaintiff's claim began to run on December 18, 2014.

This case, however, is factually distinguishable from *Wike* and its progeny. In *Smith v. Bank of Hawaii*, the court "conclude[d] that *Wike* cannot logically be extended to the facts of this case, which involves allegedly *unauthorized* overdraft fees." 2018 WL 1662107, at *5 (D. Haw. Apr. 5, 2018) (emphasis in original). In the court's view:

> The difference between preauthorizing a series of transfers and opting in to an overdraft services is both significant and meaningful. In the first instance, a consumer gives express permission for a series of recurring transfers from his or her account. But in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee or charge, let alone a series of them.

*Id.*; *see also Pingston-Polling v. Advia Credit Union*, 2018 WL 3758088, at *3 (W.D. Mich. Aug. 8, 2018) ("This Court agrees with the reasoning in *Smith* . . . [that] overdraft fees constitute discrete harms that do not constitute a single transaction providing for recurring transfers.").

Indeed, Regulation E seems to contemplate that this distinction is a meaningful one. On the one hand, Regulation E requires preauthorized transfers to be in writing but only focuses on the authorization itself. 12 C.F.R. § 1005.10(b). On the other hand, with regard to overdraft services, the statute not only focuses on the requirements for opt-in provisions, but also prohibits

13

"any fee or charge on the consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service" without making the appropriate disclosures. 12 C.F.R. § 1005.17(c)(2). "Thus, the *violation* for purposes of determining the limitation period for a preauthorized transfer may properly be characterized as an omission. But when a bank assesses overdraft fees or charges, it violates the express language of Regulation E every time it imposes a fee or charge." *Smith*, 2018 WL 1662107, at *5. I find the *Smith* court's reasoning persuasive and therefore Defendant's reliance on *Wike* and its progeny is misplaced given the facts of this case.

Plaintiff alleges that on information and belief, "at least one such instance has occurred within twelve months of filing this complaint." Compl. ¶ 38. Therefore, Plaintiff's EFTA claims, insofar as they occurred within one year of filing her complaint are not time barred.

### 2. *Claims before June 15, 2017*

With regard to Plaintiff's claims under EFTA that occurred outside of the one-year window, Plaintiff contends that the discovery rule applies. While, "it is unclear whether the one-year statute of limitations of the EFTA incorporates a discovery rule," the First Circuit has not addressed the issue. *Dorsey v. Enterprise Leasing*, 78 F. Supp. 3d 353, 357 (D.D.C. 2015). Plaintiff contends that it is likely that the First Circuit would find that the statute does incorporate the rule. *See Skwira v. United States*, 344 F.3d 64, 75 (1st Cir. 2003) ("lower federal courts 'generally apply a discovery rule when a statute is silent on the issue.'") (quoting *Rotella v. Wood*, 528 U.S. 549, 555, 120 S.Ct. 1075 (2000)). Thus, I will assume that the discovery rule is available to Plaintiff here.

The "discovery rule allows a claim to accrue when the litigant first knows or with due diligence should know facts that will form the basis for an action." *Randall v. Laconia, N.H.*, 679

F.3d 1, 7 (1st Cir. 2012) (internal quotation marks omitted). Whether a litigant should have known is evaluated against the objective standard of what a "reasonable person similarly situated to the plaintiff would have known." *McIntyre v. United States*, 367 F.3d 38, 59 (1st Cir. 2004) (emphasis omitted). In order to apply, "the factual basis for the cause of action must have been inherently unknowable that is, not capable of detection through the exercise of reasonable diligence at the time of injury." *Sanchez v. United States*, 740 F.3d 47, 52 (1st Cir. 2014) (internal quotation marks omitted).

Plaintiff argues that this Court should not resolve whether the discovery rule applies on this motion as it involves a fact-intensive inquiry. *See Abdallah v. Bain Capital LLC*, 880 F. Supp. 2d 190, 198 (D. Mass. 2012) ("Although determining whether the discovery rule, fraudulent concealment, or equitable tolling should apply in a case is a question of fact to be determined by the finder of fact, the court can grant a motion to dismiss if no set of facts would entitle the plaintiff to relief."); *In re Tyco Intern., Ltd.*, 2004 WL 2348315, at *18 (D.N.H. Oct. 14, 2004) ("the discovery rule generally will not be resolvable on a motion to dismiss, unless it is plain from the complaint itself that the plaintiffs' claims are time-barred.").

While application of the discovery rule is often fact-intensive, here I find that the discovery rule does not apply as a matter of law. "In the context of EFTA claims . . . the discovery rule [will often] not apply because a plaintiff could reasonably discover an injury by reviewing his bank statement or online account which would show that a fee or fees had been improperly assessed." *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 351 (D.N.H. 2018); *see also Harvey*, 2015 WL 9268125, at *4 ("If Harvey had exercised due diligence, she should have discovered the injury either by looking at her Google account or even more simply, looking at her bank statements.").

15

Plaintiff claims that she could not have discovered the facts which form the basis of her claim because Defendant concealed its practice of using the "available balance" method from its customers. Plaintiff's argument is unpersuasive. Plaintiff alleges in her complaint that she was charged an overdraft fee when her account had a positive "ledger balance." Therefore, had Plaintiff checked her bank statements, she "should have known when [she] was charged [her] first overdraft on a positive ledger balance that [Defendant] was *not* using the ledger balance method to assess overdraft fees." *Domann v. Summit Credit Union*, 2018 WL 4374076, at *10 (W.D. Wis. Sept. 13, 2018). Accordingly, Plaintiff's claim was not inherently unknowable. Indeed, had she used reasonable diligence, she could have easily discovered the factual foundation of her claim. She is therefore not entitled to rely on the discovery rule for her EFTA claims that occurred more than one year before she filed her complaint.

## **Conclusion**

For the reasons stated above, Defendants motion (Docket No. 12) is ***granted*** in part and ***denied*** in part. Claims IV and V are dismissed. Claims I, II, and III survive Defendant's motion to dismiss. Finally, Claim VI survives Defendant's motion only for claims that occurred on or after June 15, 2017.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
